IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

23-10-

| | |
|---|---|
| HAROLD R. BERK,<br>    Plaintiff, | CIVIL ACTION NO. |
| vs. | JURY TRIAL DEMANDED |
| TERUMO MEDICAL CORPORATION,<br>TERUMO AMERICAS HOLDING, INC.,<br>    Defendants. | |

# COMPLAINT

1. Plaintiff Harold R. Berk is a resident and citizen of the State of Florida who resides at 17000 SW Ambrose Way, Port St. Lucie, Florida 34986. He also owns, together with his wife, real property at 207 Samantha Drive, Lewes, Delaware 19958. Plaintiff was an attorney for 51 years and retired as of July 1, 2022.

2. Defendant Terumo Medical Corporation is a Delaware corporation with offices in Somerset, New Jersey; Elkton, Maryland and other offices in the United States and with an office in Tokyo, Japan. Defendant Terumo Medical Corporation filed a change of name with the New Jersey Treasurer changing its name to Terumo Americas Holding, Inc.

3. Defendant Terumo Americas Holding, Inc. is a Delaware corporation with offices in Somerset, New Jersey; Elkton, Maryland and other offices in the United States and with an office in Tokyo, Japan.

4. Hiroshi Nagumo is the CEO and President of Terumo Medical Corporation; Terumo Americas Holding, Inc. and Terumo Corporation of Tokyo, Japan, and both of the Terumo Delaware corporations are essentially alter egos of Terumo Corporation of Japan. Defendants Terumo Americas Holding, Inc, and Terumo Medical Corporation are referred to collectively as "Terumo."

5. This is an action for compensatory and punitive damages against each of the defendants for product liability as each and together manufacture a medical device called an Angio-Seal which they manufacture, market, distribute and sell to medical providers and hospital facilities though out the United States which Angio-Seal is used to create hemostasis in a femoral artery (stop bleeding) after a medical procedure requiring puncture and entry of the artery.

6. This Court has jurisdiction over this matter under 28 U.S.C. §1332 as the matter is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7. Venue is proper in this Court under 28 U.S.C. §1391 as each of the defendants is incorporated in the State of Delaware and its places of business are in New Jersey and Maryland as well as in other states and foreign countries. Plaintiff spends summers at their house in Lewes, Delaware.

## FACTS

8. Plaintiff was examined by Dr. Nicholas Ruggerio, the head of the interventional cardiology department at Jefferson University Hospital in Philadelphia for two years to determine whether Plaintiff should have a Transcatheter Aortic Valve Replacement ("TAVR") procedure to insert a new aortic valve in his heart as the valve had moderate to severe stenosis. Dr. Ruggerio was reluctant to operate due to Plaintiff's other heart defects and prior open heart surgery.

9. Dr. Shah worked with Dr. Ruggerio, and he advised Plaintiff that the aortic stenosis put him at risk for syncope (becoming unconscious).

10. Plaintiff and his wife traveled to their home in Florida on or about November 15, 2021. During the early morning of December 16, 2021, Plaintiff did have a syncope episode and fell to the floor of the bathroom fracturing his left wrist, hitting his head and his foot kicked a hole in the wall as he fell.

11. Plaintiff was taken by Fire Ambulance to the emergency room at HCA Florida Lawnwood Hospital in Ft. Pierce, Florida (the "Hospital").

12. Various tests were performed including an MRI, CT Scan and others, and it was determined by Prasad Chalasani, M.D., an interventional cardiologist at the Hospital, that Plaintiff needed a TAVR operation or he could have additional syncope episodes.

13. Plaintiff was advised by Dr. Chalasani of the specifics of the TAVR procedure, and Plaintiff consented to it. Plaintiff was given a Brochure by Shelley Kennedy, RN, the Structural Heart Coordinator for the Hospital, which discussed use of a Medtronic TAVR System.

14. Plaintiff was also given a short Brochure produced by defendant Terumo Medical Corporation which lists Important Safety Information including bleeding or hematoma as potential adverse events without any elaboration. The Brochure describes potential adverse events in extremely small type with a Font size of less than 8, which I tested by reducing the Font size for this sentence.

15. Though I did not meet him before the TAVR, William Heitman, M.D. was the thoracic surgeon who worked with Dr. Chalasani as a team in performing the TAVR.

16. Prior to the TAVR, Dr. Chalasani performed certain tests and a cardiac catherization to determine if Plaintiff was a suitable candidate for a TAVR, and he determined Plaintiff was suitable for the TAVR.

17. The TAVR was performed by Drs. Chalasani and Heitman at the Hospital on December 23, 2021.

18. At the conclusion of the TAVR, Drs. Heitman and Chalsani, working as a team, inserted an Angio-Seal in Plaintiff's left femoral artery which had been punctured to insert dye to determine proper positioning of the replacement valve.

19. According to the Medical Records of the Hospital, the Angio-Seal inserted in Plaintiff was a St. Jude Scientific DAIG 6 FR. Angio-Seal. See Exhibit A.

20. But St. Jude had been acquired at the end of 2016 by Abbott Laboratories, and as part of the transaction, St. Jude sold its rights, patents and Angio-Seal business to defendant Terumo Medical Corporation.

21. After inquiries by Plaintiff as to the actual manufacturer of the Angio-Seal inserted in Plaintiff, counsel for the Hospital advised Plaintiff in a letter dated November 30, 2022 that the Angio-Seal inserted in Plaintiff was manufactured by defendant Terumo Medical Corporation. See Exhibit B.

22. The Angio-Seal inserted in Plaintiff was Terumo product number 610130, 6 French VIP and Lot No. 081589.

23. Plaintiff was transferred to the Heart ICU Unit after the TAVR for close evaluation and observation. He walked around the Heart ICU pushing a cart with monitoring equipment.

24. Preliminary information was that the TAVR was successful and the replacement aortic valve was properly placed in Plaintiff's heart.

25. Plaintiff was discharged from the Hospital on December 24, 2021 around 2:30 p.m., and he was able to walk to his wife's car, and she drove him home.

26. Plaintiff walked into their house and sat down in a chair. In about ten minutes, Plaintiff got up from the chair to take some medication.

27. As Plaintiff was taking the medication, he felt an intense pain in his left groin, and as he looked down he saw the left groin and thigh area expanding rapidly.

28. Plaintiff sat down in a chair, and his wife called the EMT personnel. As the EMT staff attempted to put Plaintiff on a stretcher, he had a syncope episode and fell unconscious back into the chair.

29. The EMT personnel managed to get Plaintiff back to consciousness and got him on the stretcher and into the Fire Ambulance. The loss of consciousness was due to severe internal bleeding.

30. The EMT personnel administered intravenous fluid to Plaintiff, but the line got tangled, and Plaintiff felt extreme nausea and felt that he was dying.

31. Plaintiff was returned to the Hospital where he was readmitted at the emergency room around 6:30 p.m. on the same date as his discharge, so Plaintiff was returned to the Hospital only about three hours after discharge.

32. The emergency room staff gave Plaintiff one or more blood transfusions, and they applied pressure to the left groin and thigh which were now about three times normal size from the accumulation of blood and bodily fluid from the internal bleeding.

33. The Hospital performed various tests on Plaintiff and readmitted him to a room. Plaintiff still had severe pain in the groin area from a very large hematoma

that had developed in the groin. The hematoma was described by one nurse as humongous, and it measured 17 cm across or as a vascular surgeon, Dr. Binette later described it, as the size of a basketball in Plaintiff's left groin.

34. On or about December 26, 2021, Dr. Chalasani came to visit Plaintiff and apologized for what happened. He said that he did not know how it happened or why it was so large, but he said it would drain naturally over time though Plaintiff would remain in pain. He said surgery was not required.

35. On or about December 28, 2021, Plaintiff was visited by Dr. Bo Wang, a vascular surgeon, who inspected the humongous and painful hematoma and said he could repair it in ten minutes, but he was not going to do that as it would drain naturally, and he wanted to be conservative.

36. Neither Dr. Chalasani or Dr. Wang examined or tested Plaintiff for continued internal bleeding, and both agreed to conservative treatment without surgery.

37. Nursing staff rolled Plaintiff from side to side to fix and adjust his bed as he could not move himself due to the size of the hematoma.

38. Finally, on January 2, 2022, Dr. Heitman came to examine Plaintiff, and he said that the hematoma would not drain naturally, and from Plaintiff's bedside, he called Dr. Christopher Binette, a vascular surgeon, and told him they needed to discuss Plaintiff's condition right away.

39. Dr. Binette did examine Plaintiff and ordered surgery which he performed on January 5, 2022 with general anesthesia to drain the hematoma, remove necrotic tissue and attempt repair. Dr. Binette then said the hematoma measured 17 cm and was the largest one he had seen in the groin area, and he again described it as the size of a basketball.

40. Dr. Binette and his partner, Dr. Jason Boccardo, performed a total of five surgeries on Plaintiff's hematoma, groin and thigh from January 5, 2022 to January 17, 2022.

41. On one evening a nurse came into Plaintiff's room and said he was lying in a pool of blood, and emergency surgery was then performed by Dr. Boccardo at 2:30 a.m. on Plaintiff to cauterize leaking blood vessels, remove necrotic tissue and drain and attempt repairs.

42. Plaintiff was put on a wound vacuum pump to drain blood and tissue from the hematoma and groin area.

43. Plaintiff was administered about eight transfusions of blood over a ten-day period as his hemoglobin levels kept declining despite the various surgeries.

44. A wound care nurse visited Plaintiff every other day to change the packing of the wound area in a procedure that was very painful to remove the packing and reinsert new packing, and hydromorphone, a drug eight times as powerful as

morphine, was given to Plaintiff to reduce the pain during these repeated procedures.

45. After Plaintiff contracted Covid while hospitalized, he was moved to an isolation unit, and then around January 23, 2022, he was transferred to the Lawnwood Rehabilitation Hospital where physical and occupational therapy were provided, and the same wound care nurse came to visit him there to continue performing the dressing and packing changes.

46. Plaintiff was discharged from the Rehabilitation Hospital on or about February 15, 2022, so he was hospitalized continuously from December 16, 2021 to February 15, 2022 except for the three hours after his first discharge on December 24, 2021.

47. After Plaintiff returned home, he had home health care nurses performing wound care of the hematoma area, and he was also provided physical and occupational therapy at home for several months.

48. As a result of the long-term hospitalization and his movement limitations from the surgeries and the hematoma, Plaintiff has difficulty walking and has balance problems. He is required to use a cane while walking.

49. Since the balance and leg strength problems continued, Plaintiff's neurologist, Dr. Kellenberger of Cleveland Clinic, ordered physical therapy at the

Cleveland Clinic Rehabilitation center in Port St. Lucie, Florida, and he is currently scheduled for continuing physical therapy there.

50. Medicare has approved medical and hospitalization expenses for Plaintiff's medical care arising from the 17 cm. hematoma of $1,170,132.00 as of July 1, 2022, and additional expenses for rehabilitation therapy are being incurred.

51. Terumo manufactured, marketed, distributed and sold the Angio-Seal that was inserted in Plaintiff by Doctors Heitman and Chalasani on December 23, 2021 and which Angio-Seal totally failed on December 24, 2021.

52. The Terumo Angio-Seal consists of three parts: an absorbable suture, an absorbable collagen and an absorbable anchor. According to the Terumo Brochure, "All three components dissolve and are absorbed into your body in about 90 days."

53. Terumo has published a brochure describing the Angio-Seal. See Exhibit D. Terumo has issued instructions on proper use, insertion and deployment of the Angio-Seal. See Exhibit E.

54. The Food and Drug Administration ("FDA") has issued Premarket Approvals (PMAs) for the Angio-Seal from 1996 onward with several modifications in the PMA approvals based on design and structure changes. Since Terumo acquired the rights, patents and Angio-Seal business from St. Jude Abbott

Laboratories in January, 2017, Terumo has obtained multiple PMA modifications of the PMA approvals.

55. Plaintiff has written to Terumo on multiple occasions by fax, Federal Express and email describing the events stated above, but at no time has Terumo contacted Plaintiff concerning the total failure of the Angio-Seal inserted in Plaintiff, the failure of which caused the 17 cm hematoma and severe pain and suffering.

56. To the best of Plaintiff's knowledge, Terumo has not contacted any of the above referenced doctors or the Hospital to investigate what happened to its Angio-Seal resulting in its total failure in Plaintiff's left groin.

57. Plaintiff sent a letter to Terumo describing the Angio-Seal failure on May 5, 2022, and on June 14, 2022, Terumo filed with FDA a Report of Medical Device Defect referencing and quoting Plaintiff's letter regarding the consequences of the Terumo Angio-Seal total failure. See Exhibit C being the FDA Summary of the Terumo Report concerning Plaintiff entered into the FDA MedWatch database as Number 301339497.

58. According to the FDA database, Terumo advised FDA that Plaintiff's Angio-Seal failed due to "Loosening of Implant Not Related to Bone In-Growth."

59. None of doctors Chalasani, Heitman, Binette or Boccardo or the Hospital filed a mandatory Medical Device Failure report with FDA concerning the total

11

failure of Plaintiff's Angio-Seal resulting in injury to Plaintiff despite such Reports, where injury occurs, being mandatory under 21 U.S.C. §360i.

60. The "Loosening of Implant" as reported by Terumo resulted from a Terumo manufacturing defect deviating from the FDA PMA approved design resulting in the anchor, collagen and suture not holding the Angio-Seal in place only an hour after Hospital discharge and resulting in massive internal bleeding and the creation of the 17 cm hematoma.

61. The PMA approved design for the Terumo Angio-Seal does not permit it to loosen after insertion, and it is designed to bind against the artery wall to form a seal to maintain hemostasis for at least ninety days.

62. Terumo has created and manufactured many defective Angio-Seals, as the FDA MedWatch database lists 449 incident Reports from December, 2021 to November 30, 2022 of defective 6 Fr and 8 Fr Terumo Angio-Seals with varying explanations of the deficiency and resulting patient injuries. See Exhibit F being relevant excerpts of the FDA MedWatch Database listing the defective Terumo Angio-Seals

63. The actual number of Terumo Angio-Seal failures or defects over the last year are probably higher than 449 since as in Plaintiff's case, none of the doctors filed a MedWatch Medical Device Defect Report and other doctors presumably did

the same non-filing even though the filing of Medical Device Defect Reports is mandatory under 21 U.S.C. §360i when patient injury occurs.

64. Many of the Medical Device Defect Reports indicate that the defective Terumo Angio-Seals were manufactured at the Terumo facility in Puerto Rico.

65. The defective Terumo Angio-Seal was the proximate cause of the injuries suffered by Plaintiff through the creation of the 17 cm hematoma, the massive blood loss, the need for multiple blood transfusions, the weakening of Plaintiff's legs, and the balance problems Plaintiff experiences.

## FIRST CAUSE OF ACTION – PRODUCTS LIABILITY MANUFACTURING DEFECT

66. Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 65 above.

67. FDA approved a PMA for the Terumo Angio-Seal providing that by following the approved design, the product would remain effective in preventing blood loss from the artery puncture wound for a period of at least ninety days when the collagen and anchor components dissolved.

68. Due to the manufacturing defects in the Terumo Angio-Seal inserted in Plaintiff from Lot No. 0081589, the Angio-Seal failed after only one hour from discharge from the Hospital on the day following the TAVR procedure.

69. The manufacturing defect resulted in the anchor not continuing to bind to the collagen or the suture allowing the Angio-Seal to loosen, in the words of Terumo in its FDA Report.

70. Due to the numerous Medical Device Defect Reports submitted to FDA, the Terumo Angio-Seal is a highly dangerous and inherently dangerous product and is rated as a Class III product by FDA meaning it has a higher propensity for failure.

71. Defendant Terumo is strictly liable for Plaintiff's injuries arising from the defective Angio-Seal resulting from a manufacturing process not consistent with the FDA approved design plans.

72. Plaintiff has incurred medical and rehabilitation expenses in the amount in excess of $1,100,000 as a result of the defective Terumo Angio-Seal, and Plaintiff has endured long term pain and suffering resulting from the defective Terumo Angio-Seal.

73. Defendants have received hundreds of reports of defects in the Terumo Angio-Seal but they have failed to correct the manufacturing defects, despite their knowledge, making them liable for punitive damages.

WHEREFORE, plaintiff prays that Judgment be entered in his favor for compensatory and punitive damages in an amount in excess of $75,000 together with his costs and expenses.

## SECOND CAUSE OF ACTION- NEGLIGENCE

74. Plaintiff realleges and incorporates the allegations of paragraphs 1 through 73 above.

75. Defendants owed a duty to Plaintiff not to place a defective medical device in the marketplace that was liable to cause damage and injury.

76. Defendants were negligent in manufacturing, marketing, distributing and selling the Angio-Seal device installed in Plaintiff as the product contained defects which were known or should have been known to defendants based on the numerous reports of Medical Device Defects for the Terumo Angio-Seal submitted to the FDA.

77. The defects that were known or should have been known to defendants were not consistent with the duty of care that defendants owed Plaintiff to not submit defective medical devices for use in TAVR procedures.

78. Defendants took no action to remedy the defects in the Angio-Seal inserted in Plaintiff before it left their manufacturing facility, and they were negligent in not doing so.

WHEREFORE, plaintiff prays that Judgment be entered in his favor for compensatory and punitive damages in an amount in excess of $75,000 together with his costs and expenses.

## THIRD CAUSE OF ACTION- FAILURE TO WARN

79. Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 though 78 above.

80. Defendants had a duty to warn Plaintiff that a defective Terumo Angio-Seal could result in a humongous hematoma of 17 cm. with massive internal bleeding and blood loss.

81. Plaintiff was provided with only a Terumo Brochure which stated in a Font smaller than 8 that bleeding or a hematoma could result, but without any further elaboration of the size, extent, or dangerousness of a humongous hematoma that did result from Defendants' defective Angio-Seal. See Exhibit G.

82. Terumo did not warn Plaintiff that he could not stand up from a chair after the Angio-Seal implant.

83. Defendants had a duty to warn Plaintiff of the severe adverse effects that could result, including life threatening events, that could and did occur with a defective Terumo Angio-Seal.

84. Defendants failed to warn Plaintiff that he could and did suffer the 17 cm hematoma and internal bleeding and blood loss that resulted from the defective Terumo Angio-Seal.

WHEREFORE, plaintiff prays that Judgment be entered in his favor for compensatory and punitive damages in an amount in excess of $75,000 together with his costs and expenses.

## FOURTH CAUSE OF ACTION
## NEW JERSEY PRODUCTS LIABILITY ACT

85. Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 84 above.

86. Defendants Terumo have their principal place of business in the United States at 265 Davidson Avenue, Somerset, New Jersey.

87. Defendants are subject to the New Jersey Products Liability Act, N.J. Stat. Ann. § 2A:58- C et seq., for manufacturing defect and inadequate warnings.

88. The Terumo Angio-Seal inserted in Plaintiff failed to meet the design criteria approved by the FDA in a PMA due to a manufacturing defect that caused the anchor to separate from the collagen together with failing of the suture.

89. None of the claims in Plaintiff's First, Second, Third or Fourth Causes of Action are pre-empted by the Medical Device Amendments of 1976 as they all arise from manufacturing defects deviating from the FDA approved designs.

90. Defendant Terumo provided inadequate warnings to Plaintiff as there was no warning that a 17 cm hematoma could result from a defective Angio-Seal with the need for five surgeries under general anesthesia.

91. The Brochure provided by Terumo only stated in a font less than 8 that a hematoma could result, but hematomas can be tiny and most are unlike the 17 cm hematoma that Plaintiff experienced requiring five surgeries.   See Exhibit G.

92. The manufacturing defects were the proximate cause of Plaintiff's 17 cm hematoma injury together with the massive internal bleeding that was left untreated and without surgery at the Hospital for 10 days.

93. Defendants were aware of the numerous reports of Medical Device Defects concerning the Terumo Angio-Seal that were filed with FDA, but they failed to take action to correct the known defects that resulted in major injuries for patients.

94. Defendants Terumo have designated an employee to receive all of the Medical Device Defect Reports filed with the FDA, being Gina Digioia who has offices in both Somerset, New Jersey and Elkton, Maryland, so Terumo is keenly aware of the numerous Medical Device Defect Reports filed concerning the Terumo Angio-Seal.

WHEREFORE, plaintiff prays that Judgment be entered in his favor for compensatory and punitive damages in an amount in excess of $75,000 together with his costs and expenses.

Respectfully submitted,

Harold R. Berk, Pro Se.
17000 SW Ambrose Way
Port St. Lucie, Florida 34986
215-896-2882
haroldberk@gmail.com

## DECLARATION

Plaintiff Harold R. Berk hereby declares, under penalty of perjury, that the above and foregoing statements are true and correct to the best of his knowledge, information and belief.

*[signature]*
Harold R. Berk, Plaintiff Pro Se